Fuchsberg, J.
The Workmen’s Compensation Board found that Maurice Malacarne was killed in the course of his employment. The Appellate Division held that he was not and, *190 accordingly, reversed. For the reasons which follow, we believe its decision should be upheld.
The decedent’s usual job, as one of two part-time attendants who manned a Yonkers Raceway parking lot, was to jockey cars, collect parking fees and, shortly before its 11 p.m. closing time, deposit the evening’s proceeds in a bank located directly across the street. However, on January 23, 1971, having arranged for his coemployee to take sole charge, Malacarne quit work about 45 minutes earlier than usual in order to meet his wife at a party at her brother Frank Merola’s home, about a half hour’s automobile drive away from the parking facility. Having parked his car near his brother-in-law’s house, the decedent was walking toward it when he was shot to death by an unknown assailant.
No witness either to Malacarne’s activities while he was en route from his job to the party or to the shooting itself has ever been found. Members of the decedent’s family, as well as neighbors who heard the shot, found the wounded man lying on the sidewalk in front of the house. Malacarne’s personal possessions, which included a wallet containing about $250 in cash, were intact.
The authorities had arrived almost at once, initially in the form of two patrol cars in charge of police officers named Campanelli and Masi. They immediately questioned the injured man, being able to do so without any difficulty since Malacarne, who was soon thereafter to lapse into an incommunicative state from which he was never to recover, was then still both conscious and lucid. Following that inquiry and the garnering of such information as brother-in-law Merola, himself a police officer, and a second brother-in-law, who had also attended the party, were able to furnish, Officer Masi that very night made entries in his official memorandum book as required by police department regulations. He noted therein that the decedent had said that his assailant "was wearing a tan full length trench coat”, that he "appeared nervous”, that he acted like he was "fooling around”, that, so far as the weapon was concerned, he "had in his hand what appeared to be an umbrella”, that "he [Malacarne] offered money to the assailant”, an offer the assailant did not accept, and that Malacarne then "walked away at a fast pace yelling for his brother-in-law”, the policeman.
The decedent was rushed to the hospital by ambulance within about five minutes after the police arrived. At the *191 hospital, only about 10 minutes after decedent had left the scene, Masi checked on the information he had received by reinterviewing Malacarne; Malacarne had nothing to add. As Masi put it, "[h]e told me the same thing he told me at the scene.”
The physician charged with the duty of obtaining a history from Malacarne at the hospital also advised Masi that Malacarne had told him "approximately the same thing”. Specifically, the doctor’s entry stated that Malacarne said that he had been shot, that he had told his assailant not to fool around with him because his brother-in-law was a police officer and that it was while he was running away shouting for his brother-in-law that he was shot in the back. The hospital record indicated that the bullet had indeed entered from the back, a fact further confirmed by the location of the powder burns.
Thereafter, starting with the night of the shooting, under the direction of an officer named Lieutenant Pellicci, the police, with the co-operation of both the District Attorney and the Sheriff’s office, undertook a long, intensive and wide-ranging, though ultimately unsuccessful, investigation to solve the crime. In the search for clues and a motive there were conversations with decedent’s brothers-in-law, neighbors and others who might possibly shed some light on the inquiry. The voluminous file thus generated in the end showed not a bit of information beyond that originally reported by Masi. After the exhaustion of all possible sources of information, Malacarne’s killing had to be regarded as an unsolved street crime.
But the scene then shifts. The time is almost a year and a half later. The setting is the workmen’s compensation hearing. The dramatis personae are the same, but the story is different.
Brother-in-law Merola testifies that decedent, while lying on the sidewalk after the shooting, told him that his assailant had demanded "the money bag with the money from the parking lot” and that he said "that if it was money that he wanted, to take his own wallet”. In view of the fact that Merola was himself an experienced police officer, that he recognized that motive was central to any possible discovery of those who had murdered his sister’s husband, and that he had discussions "in relation to the crime” with the investigating police officers on various occasions, it is odd that his justification for never having told the authorities so much as a *192 word about decedent’s reference to a "money bag” is a lame "nobody asked me that” and "in the excitement, it was slipped up”. Most interestingly, the police records do indicate that it had never occurred to Merola to volunteer the dead man’s words even though he otherwise aggressively encouraged Lieutenant Pellicci to try to find a link between the decedent’s employment and his death. Pellicci’s efforts proved no such link.
The manner of the testimony of the second brother-in-law also merits comment. His initial testimonial description of the decedent’s sidewalk statement is bare of any "money bag” reference; it becomes necessary for claimant’s counsel to prod him in order to get him to flesh out the dying man’s words so as to include "They asked for the money bag”. It is even stranger that the single neighbor and friend of Merola’s who appears with him before the compensation referee testifies that he heard practically nothing of the Merola conversation with the decedent except the remark about a money bag. "That is all I heard”, he insists. It never seems to have occurred to either of these witnesses that any of the dozen or more police officers at the scene or those who made the later investigative inquiries would find this information of interest.
Finally, Officer Masi, following Officer Merola to the stand, enlarges on his official police entries by the vague recollection that, "As I recall, something was said that he usually made the deposits from the parking lot at Yonkers Raceway, and this night he did not”, to which he voluntarily adds his own pure speculation, "/ thought at this time this is what they were after”. Queried about why this matter was omitted from his written report in what had all the earmarks of a first degree murder case, he takes refuge behind the assertion that "in the confusion you can forget something and not put something down”.
Despite the fact that somehow not one of these witnesses’ hearsay knowledge of a possible motive for robbery found its way into the formal and official records of the thorough investigation the authorities had made and that no other proof of any kind linked Malacarne’s work with his shooting by an unknown person at a time long after he had left his job and at a place half an hour’s drive away, the board found that Malacarne’s injuries arose "out of and in the course of’ his employment (Workmen’s Compensation Law, § 10).
*193 It is pertinent therefore to say that, while courts called upon to review quasi-judicial findings of an administrative agency are of course bound to affirm those supported by substantial evidence (Matter of Fisher [Levine], 36 NY2d 146, 150), and, in a workmen’s compensation case, there is a statutory presumption that "in the absence of substantial evidence to the contrary * * * the claim comes within the provision of this chapter” (Workmen’s Compensation Law, § 21, subd 1), it is well established that a claimant is not thereby totally relieved of "the burden of showing that accidental injuries suffered by him actually were sustained in the course of his employment and arose out of the employment” (see Matter of Seymour v Rivera Appliances Corp., 28 NY2d 406; Matter of Daus v Gunderman & Sons, 283 NY 459, 465). Without such proof, an award cannot properly be granted; it is then unsubstantiated under the law.
It should be noted that the test to be met is stated in the conjunctive. The injury must be one "arising out of’ the employment, that is, it must be "a natural incident to the work * * * one of the risks connected with the employment, flowing therefrom as a natural consequence and directly connected with the work”. It must also arise "in the course of the employment”, that is, "it must have been received while the employee was doing the work for which he was employed” (Matter of Scholtzauer v C. & L. Lunch Co., 233 NY 12, 14-15; Matter of Wilson v General Motors Corp., 298 NY 468).
Consequently, even when injuries arise out of the employment, the employer is under no duty to compensate his employees if the injuries arise while the employees are "pursuing their private interests on their own time and at a distance from their employer’s premises”, since they would then not be in the course of their employment (Matter of Wilson v General Motors Corp., supra, p 476). If, therefore, there was no proof in the present case that the death arose "in the course of’ the employment, it becomes unnecessary for us to consider whether it arose "out of’ it, or whether, though hearsay evidence alone may be sufficient to support a compensation finding, it here so challenged credulity that it did not meet the substantial evidence test (cf. 3 Larson, Workmen’s Compensation Law, § 79.23). On the other hand, if the death here arose in the course of the employment, it would be presumed that it also arose out of it (Matter of Slade v Perkins, 33 NY2d 988, 989).
*194 We turn directly, therefore, to the "course of employment” question.
Generally, absent some physical connection to the premises of an employer in time and space, an accident which befalls an employee on his way to or from work has not arisen "in the course of the employment” (Schwimmer v Kammerman & Kaminsky, 262 NY 104; Matter of Trent v Collins Tuttle & Co., 20 AD2d 948; Matter of Douglas v Kenn-Well Contr. Co., 249 NY 609; Matter of McGrinder v Sullivan, 290 NY 11; Matter of Wood v New York State Dept. of Environmental Conservation, 46 AD2d 961).
There are variations on this rule, however, particularly in cases involving robberies and assaults on employees. Analysis of such cases shows them to have been rooted in events which, though perhaps completed at other times or places, started at or about the premises of the employer.
Matter of Field v Charmette Knitted Fabric Co. (245 NY 139), may be regarded as the grandfather of such cases. It involved an altercation between two employees which began inside the employer’s premises, was stopped by neutral employees, and was resumed as the assaulted man stepped over the factory threshold onto the sidewalk. As Chief Justice Cardozo there put it (p 142), "[cjontinuity of cause has been so combined with contiguity in time and space that the quarrel from origin to ending must be taken to be one”.
Field’s progeny have presented similar situations. Thus, in Matter of Craig v Jefferson Auto Painting Co. (33 AD2d 526), a shop steward threw the contents of a chemical solution on a coemployee after their day’s work was finished and both had left the employer’s premises; the act followed a threat made earlier by the steward during an on-the-job work-related dispute. In overruling appellants’ contention that the incident did not arise in the course of the employment, the court noted that the "fulfillment of threats uttered during working hours, in the course of a work-connected argument, was compensable * * * under the continued altercation rule” because it was "commenced within the time and space limits of the employment”.
Similarly in Matter of Feuchtbaum v Simwitz Bros. Trucking Co., (28 AD2d 575), an employee who was a shop steward was assaulted by two fellow workers who resented his having made a complaint against them. They having requested to see him after he punched out, he immediately went across the *195 street from the employer’s premises to meet his assailants, whereupon the assault occurred. In upholding a finding that the event took place in the course of the employment again the court considered the crucial issue to be whether the entire chain of events was, realistically evaluated, but a single incident begun at a time when the "claimant had not separated himself from the animosities and danger of employment”.
It is noteworthy that in none of these cases was where, how, why and with whom the event had started a matter of conjecture.
Matter of Seymour v Rivera Appliances Corp. (28 NY2d 406, supra), on which appellant relies, is not to the contrary. All the injuries in that case took place on the employer’s premises, and there was never any question but that they had arisen in the course of the employment. The episode there had been initiated when the deceased went to the aid of a female employee who worked under his direction when she was assaulted by another male employee. The deceased had no personal relationship with either the lady in distress or with her assailant. The next day the other male employee shot the deceased on the employer’s premises. The sole issue litigated was whether the shooting arose "out of’ the employment.
Nor is claimant aided by our decision in Matter of Notowitz v Rose Towel & Linen Supply Co. (36 AD2d 543, affd 29 NY2d 502). Though the attackers there were not themselves coemployees of the victim, they were permitted to loiter about the doorway of the employer’s garage to which the claimant, a route salesman, was required to bring his truck. They began to chase him from the very door of the garage, catching him within a block. Our affirmance on the theory that the employer’s obligation to provide a safe means of egress from its premises extended at least to these facts in no way suggested abandonment of the requirement that, for an event which befalls an employee after he departs from his employment to be deemed to have arisen "in the course of’ his employment, it must have been one that "commenced within the time and space limits of the employment.” Indeed, to the extent that today’s dissent omits from the test for "in the course of the employment” any requirement of "contiguity in time and space” (Matter of Field v Charmette Knitted Fabric Co., 245 NY 139, 142, supra), relying instead solely on "continuity of cause”, it would serve but to blur the long-recognized and *196 meaningful distinctions between the "arising out of’ and the "arising in the course of’ employment tests.
Consequently, if, in the case before us, there had been substantial evidence rather than mere conjecture to support a finding that an attempted robbery had begun at the deceased’s point of departure from the parking lot itself, the board might have been entitled to consider whether that event and the subsequent shooting were but two parts of a whole. The reality, however, is that there was not a scintilla of evidence of any earlier event related to the shooting. The "money bag” statement attributed to the decedent during the testimony before the referee does not supply it. That bare statement did not include, for instance, anything to indicate that suspicious persons had been lurking in the vicinity of the parking lot, or that anyone had been seen to follow the decedent from there or, for that matter, that he had observed anyone following him at any time during his half hour’s drive to his sister’s house until he had already arrived on her street. Even assuming that the decedent had in fact made the "money bag” statement and, in doing so, had accurately quoted his assailant, on the record here we are left then with nothing but speculation on which to base a choice from among the countless number of possibilities of where, how or why the assailant came to the erroneous belief that Malacarne would have a money bag on him when he arrived at his sister’s house.
Specifically, the possibility that there had been an observation at the parking lot itself is an especially unlikely one; an uninformed observer would have had no reason to believe that Malacarne was carrying the receipts when he left with the lot still in full operation that night, and one familiar with the lot’s operation would have known that deposits were never carried further than the bank across the street and then only at closing time. Further, while the precise motive of the assailant would not be determinative, there is much mystery even as to whether it was robbery that was intended at all; the rejection of the offer of the wallet, which contained a larger sum than the average receipts from the small parking lot, strongly negates even that part of the theory. In any event, the money bag testimony, if some evidence on the "arising out of’ question, certainly did not satisfy the essential requirement that the accident had arisen "in the course of’ the employment.
In short, the decedent here performed his work only at the *197 parking lot, his workday started the moment he arrived there, and, on the day of the shooting, it ended as usual when he drove away. His job did not demand travel. He was not on an errand for his employer. He was not required or permitted to take the proceeds or any other indicia of his employment with him when his day’s work was done, and he followed that rule on this occasion.
Under those circumstances, he was precisely in the same position as are thousands of retail employees who handle money on the premises of their employers and whose jobs include short trips to the bank during the workday in order to exchange money or make a deposit. Their employers do not become subject to liability in workmen’s compensation if, at places and times when they are away from work, they are attacked by predators who hope that the employees are then in possession of the employers’ money. Whatever other means of coverage there may be or, as some believe, there should be to protect such employees against such vicissitudes (Matter of Scholtzhauer v C. & L. Lunch Co., 233 NY 12, 15, supra), the scope of liability under the Workmen’s Compensation Law is fixed by the range of the employment and not by the misconceptions of the predators.
Accordingly, the order of the Appellate Division should be affirmed.